IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CRAIG ALFRED LIGHT,

    Petitioner,

v.

MICHAEL MARTEL,

    Respondent.
_____/

No. 09-00177 JSW

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

Petitioner Craig Alfred Light ("Light"), a prisoner of the State of California currently incarcerated at Mule Creek State Prison, Ione, California, has filed a petition for writ of habeas corpus ("Pet.") pursuant to 28 U.S.C. § 2254. This Court ordered Respondent to show cause as to why claims raised in the petition should not be granted. Respondent filed an answer, a memorandum of points and authorities ("Opp. Br.") in support thereof, and exhibits. Light subsequently filed a traverse. After consideration of Light's claims, the Court DENIES the petition for writ of habeas corpus on the merits.

## PROCEDURAL BACKGROUND

On January 15, 2003, a jury found Light guilty of one count of lewd and lascivious act on a child under fourteen in violation of California Penal Code § 288a(a), with a prior conviction of § 288a within the meaning of § 667.61(a) and (d); and one count of molesting a child under eighteen with a specified prior conviction of § 288a in violation of § 647.6(c)(2). Light admitted the prior strikes alleged in count 2 before the presentation of evidence and he

1  admitted the remaining prior strikes after the jury returned its verdict.

2  On June 13, 2003, the court entered judgment against Light. The court sentenced Light to state prison for a term of 105 years to life. On October 4, 2004, Light filed a petition for writ of habeas corpus before the California Court of Appeal, Sixth Appellate District. On November 10, 2004, the Court of Appeal issued an order to show cause returnable to the Superior Court for an evidentiary hearing. On December 17, 2004, Light filed a petition for review with the California Supreme Court. On February 16, 2005, the California Supreme Court denied Light's petition for review.

The Superior Court conducted an evidentiary hearing relating to Light's habeas petition on February 26 and 27, 2006. Judge James C. Emerson, the trial judge of the initial proceeding, also presided over the evidentiary hearing. At the hearing, the parties elicited testimony from Light's trial counsel Yolanda Trevino ("Counsel"), the victims' father Thomas Coonen ("Father") and the victims' neighbor Evra Gene Hurst ("Hurst"). On March 15, 2007, Judge Emerson denied Light's habeas petition.

On October 11, 2007, Light filed a petition for writ of habeas corpus in the California Court of Appeal, Sixth Appellate District. On October 30, 2007, the Court of Appeal denied Light's petition. On November 9, 2007, Light filed a petition for review in the California Supreme Court. On January 16, 2008, the California Supreme Court denied Light's petition for review. On January 14, 2009, Light filed a petition for writ of habeas corpus with this Court.

**FACTUAL BACKGROUND**

The facts underlying the charged offenses, as found by the California Court of Appeal, Sixth Appellate District are summarized in relevant part, as follows:

> From June through December 2001, sisters 12-year-old victim 1 and 11-year-old victim 2 had weekend visitation with their mother in her ground floor apartment in San Jose. Mother was friends with [Light], her 42-year-old neighbor in the other ground floor unit, and she encouraged the girls to visit him in his apartment to watch movies from his extensive collection. The girls would go in the daytime, watch a movie with the lights off, and return to their mother's apartment. Mother rarely watched movies with them although sometimes a friend of [Light]'s was there. Usually it was just [Light] sitting on one couch, victim 1 sitting on the other couch, and victim 2 sharing a couch with one or the other of them.

2

[Light] gave the girls licorice, ice cream, cookies, and chips. He did not yell at them or say anything mean. He gave victim 1 money for her birthday. Once when mother was there, he gave victim 2 a "raspberry" by lifting up her shirt and putting his mouth on her stomach. Her reaction was "Eeew."

[Light] usually wore shorts and a tank top. He sat slouched down on the couch with a brown baby blanket covering his stomach and lower body. When only the girls were there, [Light] would put one hand under the blanket and move it up and down or around with a shaky motion. Victim 1 said it happened almost every time they were there. He stared at the girls, moved his waist, looked uncomfortable, and made moaning sounds. Victim 1 thought [Light] was "messing with himself" under the blanket "where . . . [his] thing would be" and that it was "gross." She did not want to go over there any more but she kept going because her mother wanted her and her sister to go.

That summer, mother got a plastic pool and [Light] set it up next to the wall of his apartment. When the girls were in the pool wearing swimming suits, they could see an eye in the hole in [Light]'s bedroom wall that looked out at the pool. When the girls and mother walked by [Light]'s apartment, another strange thing he did was to make "growling" noises.

Once when victim 2 was sitting on the same couch as [Light], he took her hand and put it in his shorts. She removed her hand and moved to sit with her sister on the other couch. Her hand had been in his shorts for only seconds. She felt skin and something like a "hairy thumb." She was disgusted. When the movie ended, the girls went back home and victim 2 told victim 1 what [Light] had done but she did not tell her mother. Victim 2 was jumpy after the movie and when she talked about it, her voice was squeaky.

The girls visited [Light] only three times after that, refusing to go despite their mother's urging. Finally in January 2002 when mother told them that [Light] was a nice man and they were being mean, they told her what had happened. On the following Monday, mother telephoned Child Protective Services and then the police the same day.

On January 17, San Jose Police Detective Greg Grothaus interviewed mother and then went to [Light]'s apartment. With [Light]'s consent, he "look[ed] around" and photographed things in and outside of the apartment. Grothaus observed a DVD player and a large-screen television in the living room. Next to the DVD player, there was a collection of relatively current movies. In the top drawer of a wooden cabinet, there was a collection of science fiction DVDs. In the bottom drawer there was a collection of pornographic movies. In the closet of one of the bedrooms, there was a hole in the wall through which the back parking lot could be seen. Next to the hole was a large container of red licorice. There was no swimming pool outside when Grothaus saw the hole. The girls had seen pictures in the apartment that [Light] said he had drawn of dragons that were partly naked people, mostly women.

On January 23, Grothaus interviewed victim 1 and victim 2 at the police department's Child Interview Center. Grothaus did not wear a uniform and introduced himself to the girls as "Officer Greg." Victim 1, interviewed first, said that [Light] had never touched or threatened her. Victim 2 told Grothaus that [Light] had never touched her hand, never put her hand in his pants, and

had never touched her in any way at all. When Grothaus asked if this was the truth, victim 2 said it was. Grothaus left the room to ask mother to encourage victim 2 to be more forthcoming. Mother went to the room and told victim 2 to tell Grothaus that [Light] had placed victim 2's hand in his pants. Grothaus reentered the room and victim 2 told him what had happened.

Approximately a week after Grothaus' first visit to [Light]'s apartment, Grothaus returned to arrest him. The computer, DVD and VCR players, and collection of movies were no longer there.

. . . .

At trial, Carl Lewis [("Lewis")], a criminal investigator for Santa Clara County District Attorney's Office and an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS), was allowed to testify about the syndrome. It was designed to help professionals and adults understand better how children behave in abuse situations. Lewis investigated child sexual abuse cases for three years for the Santa Clara County District Attorney for eight of his 12 years as a police officer. He had training on the syndrome, discussions about it with his supervisor, an expert on the subject, and others, and read widely on it, especially the inaugural article on the subject called "The Child Sexual Abuse Accommodation Syndrome" by Dr. Roland Summit. Lewis also taught other investigators and prosecutors about CSAAS. He testified as an expert about 80 times in the superior courts of Santa Clara County and "a couple other counties."

Lewis did not testify about the facts of the instant case and he did not give an opinion on it. He stated that the grooming process, in connection with CSAAS, explains why children display what may seem to disbelieving adults contradictory behaviors when reporting child sexual abuse. According to Lewis, grooming is a series of behaviors that some child sexual abusers use to break down children's resistance to sexual advances and endear themselves. The offender's interaction with the child starts with extra attention, compliments, gifts, and promises, and becomes progressively more physical. It may start with back patting or massaging the neck, giving back rubs that may become mutual, and may include play such as wrestling and "slapping of the butt." These might seem very innocent to the child and even to onlookers, but they are an offender's way of getting more contact with the child.

Lewis stated it is not uncommon for an offender to expose children to "things children shouldn't be exposed to," such as pornographic movies. This lowers a child's inhibitions by having him or her see sexual conduct and by suggesting that it is natural behavior and that a child need not be ashamed because "they do it in movies." Depending on the development of the child, another "not uncommon behavior of offenders" is providing legal or illegal substances, "maybe purchasing alcohol or giving alcohol or cigarettes or control[led] substances, [such as] marijuana, . . ."

The defense presented mother's testimony that she was good friends with [Light] and allowed the girls to go to [Light]'s apartment to watch movies when they visited with her on weekends. She denied telling victim 2 to lie to the detective.

(Respondent's Exhibit ("Resp. Ex.") L at 2-7 (footnotes omitted).)

4

On March 11, 2002, in connection with the action pending against Light, an investigator for the Santa Clara County Public Defender interviewed the victims' neighbor Hurst. (Resp. Ex. P (Vol. 2) at 334.) During the interview, Hurst described Light's apartment as a "bachelor pad." (*Id*. at 340.) According to Hurst, Light's apartment was adorned with paintings of women that were inappropriate for young children. (*Id*.) In addition, Hurst had witnessed Light playing with the victims in a pool Light had set up. (*Id*. at 336.) Hurst stated that she was not sure if it was appropriate for an adult male to play with two young girls who were not related to him. (*Id*. at 338.)

Hurst believed that Mother was fixated on Light. (*Id*. at 335.) Hurst described Mother as "extremely jealous" and that Mother behaved in a confrontational manner towards Hurst. (*Id*.) Hurst reported having a conversation with Mother about the charges pending against Light. (*Id*. at 338.) Hurst said that Mother was "happy" when Mother told Hurst that Light had molested Mother's daughters. (*Id*.) Hurst thought that Mother had a tendency to make up stories. (*Id*.) Hurst believed that Mother was a jealous person and had plotted to have Light arrested. (*Id*. at 339.)

On March 19, 2002, an investigator for the Santa Clara County Public Defender interviewed Father, the custodian of the victims. (*Id*. at 352.) Father believed that Mother had developed mental issues secondary to Mother's pregnancy with Victim 1. (*Id*. at 353.) Father reported that Mother had filed reports on "just about anyone who had any contact with [Victim 1]." (*Id*. at 354.) However, Father thought that Mother had become more mentally stable and therefore allowed Mother to have the victims stay with her on a more frequent basis. (*Id*.) Father still thought that Mother had a problem with lying. (*Id*.) Father had asked Mother if Mother had any kind of romantic relationship with Light but she had always denied it. (*Id*. at 355.)

Father spoke with both victims regarding the charges. (*Id*. at 354.) Victim 2 told Father that Light had put Victim 2's hand down Light's pants. (*Id*.) Victim 1 told Father that Mother wanted Victim 1 to say that Light had done something to Victim 1, but Victim 1 refused to do so. (*Id*.) Father believed that Mother probably had to lie to both children in order to get the

5

victims to go to the police department. (*Id*. at 353-54.) Father thought that Mother would have to do so because the victims likely would not have gone willingly. (*Id*. at 354.)

At a later interview with an investigator for the Santa Clara County Public Defender, dated September 5, 2002, Father again discussed Mother's past accusations. (*Id*. at 382.) Father recalled two specific incidents where Mother had accused him of molesting Victim 1. (*Id*.) Mother called Child Protective Services both times but no further action was taken. (*Id*. at 383.) Father also recalled that Mother had once accused a babysitter of molesting Victim 1. (*Id*.) Father believed Mother had also made other accusations in the past. (*Id*. at 384.)

On March 21, 2002, an investigator for the Santa Clara County Public Defender interviewed Steve Wohlford ("Wohlford"), a friend of Light's. (*Id*. at 356.) Wohlford also knew Mother and had met her several times. (*Id*. at 357.) Wohlford was at Light's residence in the apartment complex every day for approximately nine to ten months prior to Light's arrest. (*Id*.)

Wohlford never noticed Mother paying any particular attention to Light. (*Id*. at 357.) As far as Wohlford knew, Light's relationship with Mother was platonic. (*Id*.) Wohlford stated that Light never said anything to Wohlford regarding a possible affair with Mother. (*Id*.) Wohlford never heard Light say anything about Mother having a romantic interest in Light. (*Id*. at 358.)

Wohlford reported that the victims frequently stayed at Light's apartment to watch movies. (*Id*.) Wohlford knew that Light had pornographic movies in a drawer by the couch, but that Light only showed the girls G and PG rated films. (*Id*. at 357-58.) Wohlford stated that Mother once asked to borrow money from Light. (*Id*. at 359.) Light denied her request and Mother's attitude changed "a hundred and eighty degrees" towards Light. (*Id*. at 360.)

On September 24, 2004, in connection with Light's *Marsden* motion, Counsel submitted a declaration explaining her reasons for not calling Father, Hurst and Wohlford to the stand. (*Id*. at 443.) Counsel believed that Father would testify to a prior consistent statement made by one of the victims. (*Id*.) Furthermore, Counsel thought that Father's testimony regarding a possible conflicting statement made by Victim 1 would not be relevant to the specific charge.

6

1  (*Id.*)  Counsel believed that Wohlford would testify to Light and Mother having a "platonic"
2  relationship.  (*Id.* at 444.)  Counsel thought that Wohlford would have testified that Mother
3  never paid any particular attention to Light.  (*Id.*)  Counsel also believed that Hurst would
4  testify to Light playing in the water with the victims and that Hurst considered it inappropriate
5  for Light to do so.  (*Id.*)  Hurst also would have described Light's apartment as a "bachelor
6  pad," inappropriate for small children.  (*Id.*)  Based on these assessments, Counsel determined it
7  was in her client's best interests not to call these witnesses.  (*Id.*)

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is

7

objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000), *overruled in part on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003) (citing *Williams*, 529 U.S. at 405-07).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (holding that a challenge to a state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) (holding that an "unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of the Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for the purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id.*

If the state court decision only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. *Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001); *see also Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002) (state court applied correct controlling authority when it relied on state court case that quoted Supreme Court for proposition squarely in accord with controlling authority). If the state court, relying on state law, correctly identified the

8

governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts. *See Lockhart*, 250 F.3d at 1232.

## ANALYSIS

In his petition, Light raises two claims. First, he alleges that his constitutional rights were violated by the admission of expert testimony on "grooming" behavior exhibited by sex offenders. (Pet. at 8-11.) Second, Light alleges that he was denied his Sixth Amendment right to effective assistance of counsel due to his trial counsel's failure to call certain exculpatory witnesses. (Pet. at 11-12.) Light also requests an evidentiary hearing and oral argument.

**A.     Expert Testimony on "Grooming" Was Properly Admitted.**

    **1.     Testimony Was Admissible Because It Pertained to the General Practices of Child Molesters.**

Light claims that the Superior Court improperly admitted expert testimony regarding the practice of "grooming." (Pet. at 8.) "Grooming" is the typical behavior of a child abuse offender designed to ingratiate themselves with the child through various inducements. (*Id*.) Specifically, Light argues that Lewis' "grooming" testimony was profile evidence and irrelevant. (*Id*. at 9.) Respondent contends that the trial court correctly admitted the evidence and that, in the alternative, any possible error was harmless. (Opp. Br. at 6-7.)

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of a fundamentally fair trial guaranteed by due process. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *Id*. (citing *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983)). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996). Only if

1  there are no permissible inferences that the jury may draw from the evidence can the admission
2  of the evidence violate due process. *Jammal*, 926 F.2d at 920.

3  Experts may "testify as to the general practices of criminals to establish the defendants'
4  modus operandi." *United States v. Freeman*, 498 F.3d 893, 906 (9th Cir. 2007). Such
5  testimony is admissible where it "helps the jury to understand complex criminal activities, and
6  alerts it to the possibility that combinations of seemingly innocuous events may indicate
7  criminal behavior." *United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir. 1984). Expert
8  testimony is necessary when lay persons are unable to make an informed judgment without the
9  benefit of such testimony. *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999).

10 In *Simonton v. Evans*, the Southern District of California held that expert testimony
11 regarding the typical modus operandi of child molesters was admissible. 2008 WL 4891222,
12 *7, *30 (S.D. Cal. Nov. 10, 2008). In *Simonton*, petitioner was charged with committing lewd
13 acts on a child. *Id*. at *1. At trial, a police officer testified about the general modus operandi of
14 child molesters. *Id*. at *7, *29-30. The court considered petitioner's claims that his
15 constitutional rights were violated by the admission of expert testimony as to "grooming"
16 techniques used by child molesters. *Id*. at *7. The court, citing the Ninth Circuit's *Freemen*
17 decision, 498 F.3d at 906, permitted testimony regarding the modus operandi of child molesters
18 to be admitted. *Simonton*, 2008 WL 4891222 at *7. Further, the *Simonton* court found that the
19 "grooming" testimony at issue did not concern a subject within common knowledge and nor
20 was it inadmissible profile testimony. *Id.*

21 In *United States v. Romero*, the Seventh Circuit held that expert testimony regarding the
22 modus operandi of modern child molesters was admissible. 189 F.3d 576, 585-87 (7th Cir.
23 1999). In *Romero*, defendant was charged with kidnaping and transporting a minor with intent
24 to engage in criminal sexual activity. *Id*. at 581. At trial, the court admitted expert testimony
25 regarding the practices of child abusers. *Id*. at 584-85. The prosecution sought to show that
26 "real-life child molesters use modern technology and sophisticated psychological techniques to
27 'seduce' their victims." *Id*. at 584. The court found that the expert testimony "illuminated how
28

10

1 seemingly innocent conduct such as [the defendant's] extensive discussions with [the victim] ...
2 could be part of a seduction technique." *Id*. at 585.

3 In *Romero*, defendant argued that expert testimony regarding the general practices of
4 child molesters was impermissible character evidence under Federal Rule of Evidence 404(a).
5 *Id*. at 587; Fed. R. Evid. 404(a). Federal Rule of Evidence 404(a) provides that "[e]vidence of a
6 person's character or a trait of character is not admissible for the purpose of proving action in
7 conformity therewith on a particular occasion." Fed. R. Evid. 404(a). The *Romero* court found
8 that the disputed expert testimony "focused primarily on the behavior and actions of such
9 offenders to explain their techniques or modus operandi." 189 F.3d at 587. The court held that
10 the disputed testimony was admissible because it pertained only to techniques employed by
11 child molesters and not defendant's character. *Id*.

12 In *United States v. Hitt*, the Fifth Circuit held that the admission of expert testimony
13 regarding typical behavior of child molesters, including "grooming," was not an abuse of
14 discretion. 473 F.3d 146, 158 (5th Cir. 2006). In *Hitt*, defendants were charged with
15 transporting a minor across state lines for the purpose of engaging in illicit sexual activity. *Id*.
16 at 150. The court considered defendants' claims that expert testimony regarding the practice of
17 "grooming" should not have been admitted at trial and held that the expert testimony was
18 properly admitted, noting that several other circuits had allowed such testimony. *Id*. at 158; *see
19 also United States v. Hayward*, 359 F.3d 631, 636-37 (3d Cir. 2004) (holding that expert
20 testimony regarding the general patterns of behavior exhibited by child molesters was
21 admissible).

22 Here, testimony admitted at trial indicates that Light engaged in certain behavior
23 towards the young victims. Light would give the girls sweets, show them cartoons, and engage
24 in a consistent pattern of contact. (Resp. Ex. B (Vol. 4) at 100, 68, 135.) Lewis, who provided
25 expert testimony regarding "grooming," did not testify on Light's specific behavior. (*Id*. at 183-
26 209.) Lewis had no specific information regarding the case and did not testify about his opinion
27 on the case. (*Id*. at 191.) Rather, Lewis' testimony explained how general practices and
28 behavior exhibited by child abusers is designed to ingratiate them to their victims. (*Id*. at 192.)

11

1    The consequence of these methods is purportedly to get more contact with their victims and to
2    break down their resistance to sexual advances.  (*Id*. at 192, 194.)  Lewis testified that
3    "grooming" consists of behaviors such as showing a child extra attention, complementing them,
4    giving gifts, making promises and increasing contact.  (*Id*. at 192.)  Many of these actions may
5    seem innocent to the lay person.  (*Id*.)

6         Lewis' testimony regarding "grooming" behaviors, such as showing a child extra
7    attention, helped illuminate the "general practices" child molesters employ to ingratiate
8    themselves with their victims.  *See Freeman*, 498 F.3d at 906.  Testimony given at trial by the
9    victims indicated that Light ingratiated himself with the victims by giving them sweets and
10   showing them cartoons.  (Resp. Ex. B (Vol. 4) at 100, 68, 135.)  The jury may have had trouble
11   interpreting such behaviors.  The "grooming" testimony was relevant and useful because it
12   helped clarify for the jury a particularly complex pattern of seemingly innocuous behaviors.
13   *See Johnson*, 735 F.2d at 1202 (holding that testimony about the general practices of criminals
14   is admissible where it "helps the jury to understand complex criminal activities, and alerts it to
15   the possibility that combinations of seemingly innocuous events may indicate criminal
16   behavior").  Furthermore, Lewis' testimony enabled the jury to make an informed judgment
17   about Light's activities, which would have been difficult without the benefit of such testimony.
18   *See Caro*, 165 F.3d at 1227 (holding that expert testimony is necessary where lay persons are
19   unable to make an informed judgment without the benefit of such testimony).

20        Similar to the testimony held to be admissible in *Simonton*, Lewis' testimony on the
21   subject of "grooming" explained the general modus operandi of child molesters.  *See* 2008 WL
22   4891222 at *7.  Moreover, as the *Simonton* court held, the "grooming" testimony was helpful to
23   the jury because most jurors have little experience with this subject matter and may have
24   trouble interpreting discrete innocuous actions.  *See id*.  As in *Romero*, the "grooming"
25   testimony helped show the jury that child molesters employ a variety of techniques to ingratiate
26   themselves with their victims.  189 F.3d at 584.

27        Furthermore, as demonstrated by the analysis in *Romero*, Lewis' testimony was not
28   impermissible profile evidence.  *Id*.  Lewis' testimony did not describe the general disposition

12

or character of a child molester in an attempt to show that Light acted in conformity with that character. *See* Fed. R. Evid. 404(a). Rather, similar to the "grooming" testimony held to be admissible in *Romero*, Lewis' testimony addressed the particular methods and techniques child abusers employ to assault their victims. *See* 189 F.3d at 584. Lewis focused on actions taken by child abusers, not on what their characters, personalities or common traits might be. *See id*. Accordingly, the Court finds that the "grooming" testimony was properly admitted.

**2.      The Admission of "Grooming" Testimony Was Harmless Error Because the Evidence Did Not Have a Substantial and Injurious Effect on the Jury's Verdict.**

Respondent contends that to the extent that the admission of "grooming" testimony was in error, such error was harmless. (Opp. Br. at 8.) To obtain habeas relief on the basis of a trial court's evidentiary error, Light must show that the error was one of constitutional dimension and that it was not harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Light must show that the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht*, 507 U.S. at 638).

Here, a review of the state court's record shows that any error could not have had a prejudicial effect or influence in determining the jury's verdict when assessed in context of the other evidence presented at trial. *See Penry*, 532 U.S. at 795-96. Direct testimony from the victims at trial offered compelling evidence for the jury to consider. The victims' testimony set forth Light's actions in great detail. (Resp. Ex. B (Vol. 4) at 60-179.) Victim 2 testified to Light putting Victim 2's hand down Light's pants and feeling a "hairy thumb." (*Id*. at 145.) Significant physical evidence also supported Light's conviction. Evidence that Light created a "peephole," under which Light set up a pool for the victims, was strong evidence for the jury to consider. (*Id*. at 228.) Light is therefore unable to show that the admission of the "grooming" evidence had a "substantial and injurious" effect on the verdict. *See Penry*, 532 U.S. at 795-96 (quoting *Brecht*, 507 U.S. at 638). Accordingly, this claim does not merit habeas relief.

**B.  Light's Claim for Ineffective Assistance of Counsel is Denied Because Counsel's Representation Did Not Fall Below an Objective Standard of Reasonableness and Light Has Failed to Show Prejudice.**

Light contends that he was deprived of the effective assistance of counsel in violation of the Sixth Amendment. (Pet. at 11.) Light claims that Counsel's decision not to call Father, the victims' neighbor Hurst and Light's friend, Wohlford, constitutes ineffective assistance of counsel. (*Id*.) Respondent argues that Counsel was aware of the testimony of these witnesses but made a strategic decision not to call them to the stand. (Opp. Br. at 9.)

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id*.

Ineffective assistance of counsel claims are governed by the two-prong analysis articulated in *Strickland*. *Id*. at 687. Under the first prong, a habeas petitioner must demonstrate that counsel's representation, considering all the circumstances, fell below an objective standard of reasonableness. *Id*. at 687-89. To satisfy the second prong, the petitioner must establish that he was also prejudiced by counsel's substandard performance. *Id*. at 687. One is prejudiced if there is a reasonable probability that, but-for counsel's objectively unreasonable performance, the outcome of the proceeding would have been different. *Id*. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*.

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Williams*, 529 U.S. at 404-08.

### 1. Counsel's Performance at Trial was Not Deficient.

Under *Strickland*, Light must demonstrate that his counsel's representation fell below an objective standard of reasonableness. *See Strickland*, 446 U.S. at 688. The relevant inquiry regarding whether counsel's performance fell below an objective standard of reasonableness is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance is highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

A difference of opinion as to trial tactics does not constitute denial of effective assistance, *United States v. Mayo,* 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). "A reasonable tactical choice based on an adequate inquiry is immune from attack under *Strickland*." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997).

Here, Counsel directed a defense investigator to interview the victims' neighbor Hurst, Father, and Light's friend Wohlford. (Resp. Ex. P (Vol. 2) at 332-33.) Counsel then considered the witnesses' statements, but for tactical reasons elected not to call them to the stand. (*Id*. at 443.) Counsel believed that Father would testify to a prior consistent statement made by his daughter Victim 2, and also that Father believed that the victims' accusations were true. (*Id*.) Hurst would have testified that she did not think it was appropriate for an adult male to be playing with two young girls that were not related to him. (*Id*. at 444.) Wohlford would testify that Light's relationship with Mother was "platonic" and that Mother never paid any particular attention to Light, undermining the defense theory that Mother directed the victims to make

false accusations against Light. (*Id*. at 443-44.) For these reasons, Counsel believed that calling any of these three witnesses would damage Light's defense. (*Id*.)

Counsel's decision not to call Father, Hurst and Wohlford was not objectively unreasonable. *See Sanders*, 21 F.3d at 1456. Counsel was aware of the evidence based on an appropriate investigation, but chose as a tactical matter not to use it. *See id*. Counsel's testimony indicates that Counsel made reasoned and supported tactical choices to not call the witnesses. *See id*. Counsel's decision was reasonable in light of Counsel's abovementioned concerns of how testimony from Father, Hurst or Wohlford could damage Light's case. *See id*. Accordingly, Light has failed to demonstrate that Counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 446 U.S. at 688.

### 2. Light was Not Prejudiced by Counsel's Decision Not to Call Witnesses.

Even if Counsel's performance was constitutionally deficient, Light must demonstrate prejudice. Counsel's errors must be so serious as to deprive the defendant of a fair trial. *Strickland*, 466 U.S. at 688. Light must demonstrate a "reasonable probability" that the inclusion of the omitted testimony would have made a difference at trial. *Strickland*, 466 U.S. at 694.

Here, the testimony Light sought to elicit related to Mother's credibility. (Pet. at 11-12.) However, Mother's credibility was not an issue at trial. Rather, the credibility of the two young victims was at issue. None of the testimony Light sought to elicit would have related to the victims' credibility. Light has failed to demonstrate a "reasonable probability" that testimony attacking Mother's credibility would have impacted the jury's determination of the victims' credibility and the finding on Light's ultimate guilt. *See Strickland*, 466 U.S. at 694.

With neither *Strickland* prong satisfied, the Court finds that Light's claim that counsel rendered inadequate assistance by failing to call certain witnesses is without merit. *See Strickland*, 466 U.S. at 688. Accordingly, Light is not entitled to habeas relief on this claim.

### C. Light has Failed to Demonstrate that an Evidentiary Hearing is Necessary.

Light requests an evidentiary hearing before this Court. Light seeks to confront Counsel with numerous questions regarding Counsel's decision not to call Father, Hurst and Wohlford.

16

Light concedes that the need for an evidentiary hearing is marginal. Respondent contends that an evidentiary hearing would be unnecessary and barred by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), because Light's claims can be resolved on the record before the Court.

Pursuant to Habeas Local Rule 2254-7, the Court must give due consideration to whether an evidentiary hearing should be held. *See* Habeas L.R. 2254-7. Prior to the enactment of the AEDPA, a decision concerning whether to conduct an evidentiary hearing was firmly committed to the discretion of the district court. *Baja v. Ducharme*, 187 F.3d 1075, 1077-78 (9th Cir. 1999). The amendments contained in the AEDPA limit the power of a federal court to grant an evidentiary hearing. *See Williams*, 529 U.S. at 431-38. Under the AEDPA, a district court presented with a request for an evidentiary hearing must determine whether a factual basis exists in the record to support the petitioner's claim. *Baja*, 187 F.3d at 1078. If it does not, and an evidentiary hearing might be appropriate, the court's first task in determining whether to grant an evidentiary hearing is to ascertain whether the petitioner has failed to develop the factual basis of a claim in state court. *Id*.

The AEDPA provides that a district court may not hold an evidentiary hearing on a claim for which the petitioner has failed to develop a factual basis in state court unless petitioner shows that: (1) the claim relies on (a) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense. 28 U.S.C. § 2254(e)(2).

Here, Light fails to make an argument as to the existence of a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable. *See* 28 U.S.C. § 2254(e)(2)(A)(i). Light concedes that the need for an evidentiary hearing is marginal and does not make an argument regarding a factual predicate that could not have been previously discovered through the exercise of due diligence. *See* 28 U.S.C. §

17

2254(e)(2)(A)(ii). The Court finds that Light's claims are capable of resolution by reference to the substantial state court record. Light has failed to meet his burden regarding why an evidentiary hearing would not be barred by the AEDPA. *See* 28 U.S.C. § 2254(e)(2). Accordingly, the Court denies Light's request for an evidentiary hearing.

**D.     Light has Failed to Demonstrate that Oral Argument is Necessary.**

Light requests oral argument to resolve his claim of ineffective assistance of counsel. Pursuant to Habeas Local Rule 2254-8(b), the Court may grant oral argument at its discretion. *See* Habeas L.R. 2254-8(b). Here, Light has not made a sufficient showing as to why oral argument is necessary for a proper adjudication of his habeas petition. The Court finds that Light had sufficient opportunity to argue his claims at the evidentiary hearing below. (Resp. Ex. P (Vol. 1) at 1-191.) Accordingly, the Court denies Light's request for oral argument.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter judgment for Respondent and close the file.

**IT IS SO ORDERED.**

Dated: November 30, 2009

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE